## Edward FARLEY, d/b/a STAMPS BUILDERS SUPPLY *v.* Mr. and Mrs. Charles JESTER et al

74-246                                              520 S.W. 2d 200

Opinion delivered March 3, 1975

*Keith, Clegg & Eckert.* for appellant.

*Graves & Graves,* for appellees.

CARLETON HARRIS, Chief Justice. Appellees, Mr. and Mrs. Charles Jester, desiring to build a home, requested appellant, Edward Farley, a builder, to examine their plans and submit a contract price. After some discussion on a couple of occasions, the parties met at the home of the Rev. Glen A. Park, Sr., father of Mrs. Jester, a minister and a manufacturer of furniture cream. Subsequent to this meeting, the house was built. During construction, Jester was submitted monthly invoices, and money was paid to Farley as per the invoices, until January, 1973, when the December, 1972 invoices were presented, these invoices including charges by subcontractors, and air conditioning and tile charges. Por-

tions of the invoices were paid at that time, making total payments to Farley of $53,000. According to Farley, Jester said that he did not have sufficient money to pay the complete amount of the invoices, and he was going to see his father-in-law to ascertain if the latter could help in raising the money. Further conversations were held, but on March 7, Jester directed a letter to Farley in which Jester stated:

> "I have again reviewed the invoices you have submitted for construction of my home in Forrest Hills, and find that there is a grand total amounting to $60,523.92 — of which $53,000.00 has been paid to you.

> "You will remember that our agreement was for you to construct a home for $50,000.00 or less, with me furnishing the home-site and carpeting for the floor.

> "Advances were given to you toward the completion price and they amount to $3,000.00 more than the agreed maximum total. This $3,000.00 additional was paid to you without my waiving any of my rights or remedies under our original agreement.

> "Actually, you never completed the house; the gutters, sidewalks, yard leveling and general clean-up were by someone other than you — yet you want approximately 21% more than agreed upon.

> "Please be advised that I feel you have been paid in full and cannot remit additional funds."

Thereafter, Farley instituted suit, which, after amendment, sought recovery in the total sum of $7,523.92. The Jesters answered, asserting that appellant had been completely paid for all services performed and materials delivered. Trial started on July 26 and was continued on July 28. During these hearings, the question arose of whether the chancellor was prejudiced because of his association with one of the witnesses for appellee. At the conclusion of the evidence on that date, the chancellor rendered some findings. Thereafter, on August 7, written motion was filed by appellant suggesting that the chancellor recuse himself, and this motion was denied on August 20. Subsequently, a record

was made on the motion, and further proof was taken in the case. After additional hearings, on February 5, the court entered its final decree rendering judgment for Farley in the amount of $1,530.59. From such judgment, appellant brings this appeal, and for reversal relies upon two points, *viz.*, "The court erred by refusing to recuse himself" and "The court erred in imposing a $50,000 limitation on the construction price." Since we think Point I is dispositive of the litigation, Point II will not be discussed.

During cross-examination of Mr. Park, the record reflects:

> "Q. Mr. Park, you testified to two of three things about the agreement. One of them you said was $50,000 plus 10%.
>
> A. That was a slip of the tongue. The total cost of that house as I understand it was on a cost plus basis.
>
> Q. Well, it's based on a slip of a lot of tongues because people don't agree with what was said. That's the reason I'm using that question in this case.
>
> A. Well, I resent that statement. I didn't get on this witness stand to lie. I came up here to tell the truth and that's what I'm trying to tell you."

AT THIS POINT, THE ABSTRACT REFLECTS THAT THE COURT GOES "OFF THE RECORD" AND THEN PICKS UP WITH THE FOLLOWING:

> "MR. ECKERT: My clinet is going to be impaired. He's telling the truth too. I won't agree to what this witness testified to. We'll have to impeach him. There is no way I can question him.
>
> THE COURT: I want you to do that. It might be more difficult as far as I'm concerned for you to impeach his credibility than it would be of Mr. Jester. Fact the matter is, I knew Ed Farley in business at Stamps and I thought well of him, but didn't know him as well as I do this fellow.

MR. ECKERT: I'm quite concerned about the possibility of trying a lawsuit in which anyone is held in the Court's esteem in such a great favor. It causes too great a burden. I'll go ahead.

THE COURT: Mr. Park, in view of what I have said here, Mr. Eckert is going to try to get rough with you. Keep your temper."

As previously stated, the trial continued and at the conclusion of the first hearing, the court made some findings.

It has already been pointed out that appellant had filed a motion for the chancellor to disqualify himself. Appellees argue that the motion for disqualification was not timely, i.e., it was not made at the time the issue arose; that though appellant's attorney indicated concern about going ahead with the suit, he did proceed with the trial, and authority is cited to the effect that in order to raise a matter on appeal, objections or motions must be timely made. Appellee states that appellant, after some findings of the chancellor had been rendered, should not be permitted to then question the qualifications of the court. This argument does not settle the issue for it is the contention of appellant that the motion for disqualification was made at the first hearing during the time that discussion between court and counsel was "off the record."

.This seems an appropriate time to mention the subject of courts going "off the record." The present instance is by no means the first that has occurred; rather, it has been done over the years by many courts, and this court is accordingly left in the dark as to what actually was said or transpired. Of course, there are some matters relating to procedure to be followed, or matters of a similar nature which do not justify lengthening the record, but let it quickly be said that *any* phase of the trial which relates to the testimony, other evidence, or is pertinent in any way to a determination of the litigation, should be included in the record. In other words, "If it is worth saying, it is worth placing in the record."

In the present case, at a subsequent hearing, witnesses

testified relative to what occurred during the "off the record" discussion between court and counsel. Counsel for appellant stated that the chancellor had said that the court was closely connected with the witness Park; that if the chancellor had known that Park was going to be a witness he would have excused himself, and that whatever Park testified to would be the findings of the court. The chancellor responded that he did not remember saying that what Mr. Park testified to would be the verdict of the court, and did not believe he said it; that what Park said wasn't the verdict of the court, in his opinion. He said that he considered Park to be a man of integrity and that what he had sought to do was to place appellant's counsel on notice that Park was a man he knew and that he had considerable confidence in whatever Park might say under oath and he just wanted counsel not to go easy on him because he was a preacher and because the chancellor had stated that he knew him well. He reiterated that what Park said would not dictate what the court determined, though "It may have outweighed some of the other testimony." The chancellor stated that he had had no business or social relationship with Park for ten years.

Counsel for appellee testified that the chancellor told counsel for appellant that he would have to cross-examine Park in a "tough manner or something like that to discredit his testimony," but that he did not recall whether or not the court said the testimony of Park would be the findings of the court, or words to that effect. He did remember an objection to the court's remarks, but did not remember if it were made at that time. The witness said that he remembered the chancellor commenting that he did not know Park was going to be a witness in the case, but he did not remember whether the chancellor said anything about whether he would have disqualified.

Park testified that he recalled appellant's counsel objecting to the court's comments but did not recall any of the alleged remarks made by the court.

Farley testified that Park was asked a question that he objected to and feelings were "raised a little bit", and the court stopped the case and told the court reporter, "This

would be off the record."[1] Farley said that the chancellor stated that he had known Park over 20 years and if he (the chancellor) had known that Park was going to testify, he would have disqualified himself. He then stated that the chancellor said that "Whatever Mr. Park testifies in this case will be the findings of the court"; that appellant's counsel had objected.

Probably the most significant testimony of all is that of Mr. Charles Jester, one of the appellees in the case. Jester said that he was present in the courtroom during the entire hearing and that during the cross-examination of his father-in-law, Mr. Park by counsel for appellant, a question was asked by counsel in a tone that was "sensitive to my father-in-law," who responded that he resented the line of questioning that counsel was taking, and "the way you are asking it has to do with my integrity and honesty." The witness said that the chancellor remarked to counsel "that I want to also tell you that I have known this man for a long time and I know him to be an honest man, and that he has a good reputation. If I had known ahead of time that he was going to testify in this case, I wouldn't have been presiding, but I want to state also I have known Mr. Farley for a long, long time, and he was connected with some type of court over in Stamps, and I know Mr. Farley also, but I do not know the Jesters." He said that he did not recall the court making any statement that his father-in-law's testimony would be the verdict or the findings of the court. Mr. Jester responded to a question asked by appellant's counsel as follows:

"You objected to the fact the Judge making a statement like that and you suggested that he should disqualify himself or declare a mistrial. He might not have used the word 'mistrial' but that's the way I've got it in my mind."

The witness said that he did not gather that the chancellor and his father-in-law had had a close relationship, but he assumed that the chancellor, being "a lay preacher and my father-in-law a preacher, they had known one another throughout the community."

---

[1] The court reporter testified that "I went off the record at that time on the instructions of the court."

We think, under all the circumstances, the chancellor should have disqualified himself to hear this case. In so finding, we do not mean to say, nor even imply, that the chancellor had preconceived ideas or that his friendship with the Reverend Park prejudiced his findings. To the contrary, we consider this chancellor a capable jurist and a man of integrity, a reputation that he bears over the state. As pointed out by the chancellor himself, the final judgment fell far short of conforming to the contentions of appellee, who contended vigorously that the agreement limited the cost of the home to $50,000.

However, court proceedings must not only be fair and impartial — they must also appear to be fair and impartial. This factor is mentioned in a Comment found in 71 Michigan Law Review 538, entitled, "Disqualification for Interest of Lower Federal Court Judges: 28 U.S.C. § 455', as follows:

> "Another factor to be considered in a judge's decision to disqualify is the contention that the appearance of impartiality is as important, if not more so, than actual impartiality. In 1952, Justice Frankfurter explained his disqualification in a case by stating that 'justice should reasonably appear to be disinterested as well as be so in fact.' The Supreme Court gave support to this view in the due process context when in *Murchison* Justice Black wrote for the Court:
>
> (T)o perform its high function in the best way 'justice must satisfy the appearance of justice.'
>
> More recently the Court set aside an arbitration award and stated that '(a)ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.' "

Likewise, in the Code of Judicial Conduct, prepared by the Special Committee on Standards of Judicial Conduct of the American Bar Association, and adopted by this court by *Per Curiam* Order of November 5, 1973, the Commentary to Canon 2 points out that not only must a judge avoid all impropriety, but must avoid also any appearance of impropriety.

It seems probable that the chancellor, during the period when no record was being made, may well have commented that had he known Mr. Park would be a witness, he would not have tried the case. The attorney for appellee recalled the chancellor remarking that he did not know Mr. Park was going to be a witness, although he did not recall what was said about disqualifying. However, Mr. Jester, one of the appellees, testified that the chancellor did say if he had known ahead of time that Mr. Park would testify, he (the chancellor) wouldn't have been presiding. This was also testified to by Farley, and the only person who recalled nothing about the remarks (not knowing Park would testify and disqualifying) was Mr. Park. The chancellor himself in stating his recollections, made no comment about this particular fact. Of course, if the court's relationship with a witness is such that he would, with advance knowledge that that person would testify, recuse himself — then — the matter becomes very simple — he is disqualified, and should so announce when he learns that that person will be a witness.

Actually, the statement of the court which was taken for the record, *viz.*, "It might be more difficult as far as I am concerned for you to impeach his credibility than it would be of Mr. Jester," could be taken as an implication that Park's testimony would receive more consideration, and would carry more weight than some others, particularly when he added "I knew Ed Farley in business at Stamps and thought well of him, but didn't know him as well as I do this fellow."

What we are saying is that it is understandable that appellant could feel that he was under a handicap in the trial of this case and that he might not receive impartial treatment.

Reversed and Remanded.